Tagged Opinion



**ORDERED in the Southern District of Florida on February 08, 2010.**

John K. Olson, Judge
United States Bankruptcy Court

___

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
Fort Lauderdale Division**
www.flsb.uscourts.gov

**In re**:

Nadeen S. **Harding,**

    Debtor.
_____/

Case No. 09-25447-BKC-JKO

Chapter 13

**ORDER:
(1) Denying Debtor's Amended Motion to Separately Classify Student Loan [DE 46]; and
(2) Enjoining Student Loan Creditor from Charging Late Fees, Penalties, or Collection Fees Resulting from Pro Rata Chapter 13 Plan Distributions Being Less Than Minimum Monthly Payments Required by Contract**

On November 9, 2009, Debtor Nadeen S. Harding filed an Amended Motion to Separately Classify Student Loan Payments [DE 46] in which she seeks to discriminate in favor of nondischargeable student loan debt at the expense of other nonpriority general unsecured creditors. *See id.*; [DE 35], at 2; [DE 58], at 8. A hearing was conducted on December 8, 2009 and I took the matter under advisement. For the reasons stated below, the Motion is denied. However, I will

permanently enjoin the student loan creditor from charging late fees, collection fees, or any other penalties based solely upon its *pro rata* Chapter 13 Plan distributions being less than the minimum monthly payments it would be otherwise contractually entitled to during the life of the five-year Plan.

## **Background**

On August 24, 2001, Debtor Nadeen Harding took out a student loan from Sallie Mae. *See* [DE 12], at 19.  The loan agreement calls for the Debtor to pay $300 per month to Sallie Mae over a period of time that exceeds the five-year Chapter 13 Plan.[1] *See* [DE 35], at 2.  The Debtor argues that failure to timely make the student loan payments in full may result in late fees, penalties, and collection fees which could exceed 25% of the $22,329 balance on the loan. *See* [DE 46], ¶ 2. To avoid these fees, the Debtor proposed a Chapter 13 Plan invoking 11 U.S.C. § 1322(b)(5) to make her student loan payments in full. *See* [DE 35].  As a consequence, the remaining pool of non-priority general unsecured creditors would receive a substantially reduced dividend.

The Debtor asserts that, "separate classification furthers the legislative goals of a fresh start and the repayment of non-dischargeable student loan debt ... [and] ... prevents the limitation upon the fresh start that would be created by increasing the student loan debt." [DE 46].  As discussed below, resolution of this matter requires me to analyze the language of § 1322(b) and balance three conflicting aims of the Bankruptcy Code: (1) Congress' attempts to increase the likelihood that student loan obligations will be paid in full; (2) the Debtor's "fresh start;" and (3) payment of the creditor body as a whole.

---

[1] Although the original agreement has not been filed, the Debtor's Third Amended Plan [DE 35] proposes to make the monthly student loan payments in full at $300 per month and Schedule F lists an outstanding student loan obligation of $22,329.00. *See* [DE 12], at 19.

### **Discussion**

The Debtor's motion asks me to separately classify her student loans as long term debt under 11 U.S.C. § 1322(b)(5). *See* [DE 46]. While the bankruptcy code does not define "long-term debt" in § 101, the language of § 1322(b)(5) provides that a plan may "provide for the . . . maintenance of payments . . . on any unsecured claim . . . on which the last payment is due after the date on which the final payment of the plan is due." The Debtor's final student loan payment will be due after her five-year Plan is completed. Therefore, if I were to read § 1322(b)(5) in isolation, I would conclude that the Debtor's Chapter 13 Plan is permitted to make her monthly student loan payments in full, even though this would leave less money available to other unsecured creditors.

But § 1322(b)(5) cannot be read in isolation. *See, e.g., Carpenters Health & Welfare Trust Funds for California v. Robertson (In re Rufener Constr.)*, 53 F.3d 1064, 1067 (9th Cir. 1995) ("When we look to the plain language of a statute in order to interpret its meaning, we do more than view words or sub-sections in isolation. We derive meaning from context, and this requires reading the relevant statutory provisions as a whole.") (citing *Smith v. United States*, 508 U.S. 223, 233 (1993) ("Statutory construction . . . is a holistic endeavor.")). Section 1322(b) provides that a plan may:

> (1) designate a class or classes of unsecured claims, as provided in section 1122 of this title, but **may not discriminate unfairly** against any class so designated; **however, such plan may treat claims** for a consumer debt of the debtor if an individual is liable on such consumer debt with the debtor **differently than other unsecured claims**;
>
> (2) modify the rights of holders of secured claims, other than a claim secured only by a security interest in real property that is the debtor's

> principal residence, or of holders of unsecured claims, or leave unaffected the rights of holders of any class of claims;
>
> (3) provide for the curing or waving of any default;
>
> (4) provide for payments on any unsecured claim to be made concurrently with payments on any secured claim or any other unsecured claim;
>
> (5) notwithstanding paragraph (2) of this subsection, **provide for the** curing of any default within a reasonable time and **maintenance of payments** while the case is pending **on any unsecured claim** or secured claim **on which the last payment is due after the date on which the final payment of the plan is due**; . . .

11 U.S.C. § 1322(b) (emphasis added). The Debtor points to *In re Truss*, 404 B.R. 329 (Bankr. E.D. Wis. 2009), to support the proposition that § 1322(b)(5) trumps (b)(1). *See id.* at 332. But *Truss* engaged in very little discussion to support its conclusion, merely stating with no case law support that "statutory construction principles" dictate such a result. *See id.* Interestingly, § 1322(b)(5) explicitly trumps (b)(2) by using the language "notwithstanding paragraph (2)." Congress presumably could have also explicitly trumped (b)(1) by using the language "notwithstanding paragraphs (1) & (2)" - but Congress did not to do so. The Debtor rightly argues that § 1322(b)(5) "cannot be superfluous" [DE 58], at 6. But I disagree with the Debtor's conclusion that reading (b)(5) in light of (b)(1) makes (b)(5) superfluous.

My reading of § 1322(b) is that (b)(5) was inserted to preempt a foreseeable argument by banks that (b)(2) prevents curing mortgage defaults on a debtor's principal residence. This is because, without (b)(5), no bankruptcy court would have the authority to modify the rights of such a secured claimant *in any way* because (b)(2) would prohibit it. Section 1322(b)(3) already provides "for the curing or waiving of any default," but (b)(3) does not include the phrase "notwithstanding

paragraph (2)" and therefore does not apply to residential mortgages. Congress instead chose to draft (b)(5) with the language "notwithstanding paragraph (2)" - omitting any trumping reference to subsection (1) - and provide for the curing of a residential mortgage default with the restrictive language "within a reasonable time." The interpretation that (b)(5) was inserted to avoid unintended fallout from (b)(2)'s special treatment of home mortgages is supported by one of Congress' Legislative Statements:

> Section 1322(b)(2) of the House amendment represents a compromise agreement between similar provisions in the House bill and Senate amendment. Under the House amendment, the plan may modify the rights of holders of secured claims other than a claim secured by a security interest in real property that is the debtor's principal residence. It is intended that a claim secured by the debtor's principal residence may be treated with under [sic] section 1322(b)(5) of the House amendment.

11 U.S.C.A. § 1322 (2007); H.R. REP. NO. 95-595 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6480. Subsection (b)(5) is, in effect, a modified (b)(3) designed to deal with the special treatment of mortgage lenders under (b)(2). Subsection (5) is therefore a critical part of § 1322(b). It therefore seems to me - and to other courts cited below - that reading § 1322(b)(5) in light of (b)(1) does not make (b)(5) superfluous.

The second of the Debtor's cited cases, *In re Machado*, 378 B.R. 14 (Bankr. D. Mass. 2007), is just one of many courts which agree that § 1322(b)(5) must be read in light of (b)(1) :

> It is clear that the Debtor may employ cure and maintain treatment under Section 1322(b)(5) for the her [sic] student loan debt given the occurrence of prepetition defaults and original loan maturity dates after the final Plan payment date. *See* 8 Collier on Bankruptcy P1322.09[2] (15th ed. rev.). *See also In re Saulter*, 133 B.R. 148 (Bankr. W.D. Mo. 1991). Nonetheless, **the treatment of student loan debt under Section 1322(b)(5) must not discriminate unfairly as against the Debtor's other unsecured debt**. *See In re Chandler*, 210 B.R. 898, 901 (Bankr. D. N.H. 1997); In re Coonce,

> 213 B.R. 344, 347 (Bankr. S.D. Ill. 1997). In determining whether any such discrimination is fair or not, courts consider various factors, applied to the circumstances of each particular case. These factors are variously formulated but bear upon the equitable allocation of plan resources and the furtherance of underlying policy objectives. *See In re Thibodeau*, 248 B.R. 699 (Bankr. D. Mass. 2000); *In re Bentley*, 266 B.R. 229 (1st Cir. BAP 2001).

*Machado*, 378 B.R. at 16 (emphasis added). So the Debtor has cited two cases to support discrimination in favor of her student loan obligation. One of those cases unpersuasively reads § 1322(b)(5) as trumping (b)(1). The other agrees with the view that § 1322(b)(5) must be read in light of (b)(1).

As a final note on this (b)(5) / (b)(1) issue, I must address an Eleventh Circuit case which, although not cited by the Debtor, could be misconstrued to support the Debtor's argument that § 1322(b)(5) may be read in isolation. *See Green Tree Acceptance v. Hoggle (In re Hoggle)*, 12 F.3d 1008 (11th Cir. 1994). *Hoggle* dealt with the language of § 1322(b), holding that:

> Rules of statutory construction dictate that the plain meaning is conclusive, "except in the 'rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters.' " *United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 242, 109 S. Ct. 1026, 1031, 103 L. Ed. 2d 290 (1989) (quoting *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 570, 102 S. Ct. 3245, 3250, 73 L. Ed. 2d 973 (1982)). Section 1322(b)(2) authorizes debtors to modify the rights of secured claim holders, but it provides protection for home mortgage lenders by creating a specific "no modification" exception for holders of claims secured only by a lien on the debtor's principal residence. However, notwithstanding § 1322(b)(2)'s prohibition against modifications of the rights of home mortgage lenders, § 1322(b)(5) expressly authorizes plans to provide for the timely curing of any default and maintenance of payments during the life of the plan. Section 1322(b)(5) clearly states that a plan may provide for the curing of any default. Congress could have easily inserted the word prepetition to modify default but failed to do so. The omission is significant. **The plain meaning of § 1322(b)(5) permits cure of *any* default** whether occurring prior to the filing of the petition or subsequent to

>confirmation of the plan. Thus, § 1322(b)(5) would permit cure of postconfirmation defaults.

*Hoggle*, 12 F.3d at 1010 (emphasis added). The word "any" in the above-emphasized quote is italicized in the original opinion. If one were to quote the phrase which I have emphasized in bold absent the context in which it appears, one could conclude that the Eleventh Circuit has ruled that § 1322(b)(5) may be read in isolation, and that plan treatment under (b)(5) need not satisfy the unfair discrimination test of (b)(1). In context, however, it is clear that *Hoggle* was addressing the narrow issue of prepetition versus postpetition defaults, and held that (b)(5) includes both.

Therefore, because § 1322(b)(1) explicitly prohibits unfair discrimination between unsecured creditors, and because I must read (b)(5) in the context of § 1322(b) as a whole, maintenance of payments on long term unsecured debt is only permissible if the discrimination in favor of the long term debt is not "unfair." *See, e.g., Labib-Kiyarash v. McDonald (In re Labib-Kiyarash)*, 271 B.R. 189 (B.A.P. 9th Cir. 2001) (plan treating student loan under § 1322(b)(5) must still meet unfair discrimination test); *Marshall v. Belda (In re Belda)*, 315 B.R. 477, 486 (N.D. Ill. 2004) ("student loans constituting long-term debt under § 1322(b)(5) must comply with § 1322(b)(1)'s prohibition against unfair discrimination"); *In re Pora*, 353 B.R. 247, 252 (Bankr. N.D. Cal. 2006) (distinguishing a number of cases to conclude that "there are effectively no published opinions holding that a proposed discrimination in favor of student loans classified under § 1322(b)(5) is, *ipse dixit*, 'fair' under § 1322(b)(1)" and implicitly arguing that long-term debt under § 1322(b)(5) must comply with § 1322(b)(1)'s prohibition against unfair discrimination). If I am to conclude that the Debtor's plan may discriminate in favor of her student loan, I must conclude that the discrimination is not "unfair."

*What is "Unfair?"*

Since the Bankruptcy Code is silent as to the meaning of "unfair," courts have used various tests when determining the fairness of discrimination. The Ninth Circuit Bankruptcy Appellate Panel adopted a four-pronged test which has been followed by the Eighth Circuit Court of Appeals. The test looks to: (1) whether the discrimination has a reasonable basis; (2) whether the debtor can carry out a plan without discrimination; (3) whether the discrimination is proposed in good faith; and (4) whether the degree of discrimination is directly related to the basis or rationale for the discrimination. *In re Leser*, 939 F.2d 669, 672 (8th Cir. 1991); *AMFAC Distrib Corp. v. Wolff (In re Wolff)*, 22 B.R. 510 (B.A.P. 9th Cir. 1982). This test, however, has been criticized. *See, e.g., Bentley v. Boyajian (In re Bentley)*, 266 B.R. 229 (B.A.P. 1st Cir. 2001); *In re Colley*, 260 B.R. 532, 539 (Bankr. M. D. Fla. 2000). Given the lack of uniformity in the approaches taken, some courts have held that determinations of fairness under § 1322(b)(1) should be made on a case-by-case basis. *See, e.g., In re Etheridge*, 297 B.R. 810, 816 (Bankr. M.D. Ala. 2003); *In re Colfer*, 159 B.R. 602, 611 (Bankr. D. Me.1993).

In *In re Kalfayan*, 415 B.R. 907 (Bankr. S.D. Fla. 2009), I looked to the *Leser / Wolff* test, the criticism of that test, and the argument that § 1322(b)(5) explicitly makes discrimination in favor of long term debt "fair." *Id.* at 910. I concluded that discrimination in *Kalfayan* was fair because *not* discriminating in favor of the student loan obligation would have endangered that debtor's professional license under Florida law. *Id.* The creditors being discriminated against therefore benefitted because discrimination fortified the debtor's income stream. *Id.* at 910-11.

Because I concluded that discrimination was fair in *Kalfayan*, and because it involved a long-term obligation, I held that § 1322(b)(5) explicitly allowed that debtor's Chapter 13 Plan to maintain

those student loan payments in full. In reaching that conclusion I looked to the *Leser / Wolff* test as informative, but I did not outright adopt it. Essentially, I concluded that the facts and circumstances of each case dictate whether the proposed discrimination is fair. Perhaps *Machado* better articulated the view with which I agree:

> In determining whether any such discrimination is fair or not, courts consider various factors, applied to the circumstances of each particular case. These factors are variously formulated but bear upon the equitable allocation of plan resources and the furtherance of underlying policy objectives.

*Machado*, 378 B.R. at 16. This case-by-case approach is supported by *In re Crawford*, 324 F.3d 539 (7th Cir. 2003). Although *Crawford* was superceded to some extent by BAPCPA, its holding that bankruptcy courts have broad discretion on classification of general unsecured nonpriority debt is still good law.

*Kalfayan* acknowledged, and I reiterate here, the general view that discrimination based solely on nondischargeability is unfair. *Kalfayan*, 415 B.R. at 910 (citing *Groves v. LaBarge (In re Groves)*, 39 F.3d 212, 214 (8th Cir. 1994); *In re Gonzalez*, 206 B.R. 239, 242 (Bankr. S.D. Fla. 1997); *In re Colfer*, 159 B.R. 602, 611 (Bankr. D. Me. 1993)). This is because Congress has had numerous opportunities to lift student loans out of the general unsecured category and give them priority status. Congress has demonstrated its awareness and ability to tackle the issue by both excepting domestic support obligations from discharge in § 523 *and* giving them priority status in § 507. Because student loans are treated differently (excepted from discharge in § 523 but *not* given priority status in § 507) courts should abide by Congress' decision rather than contort § 1322(b) to circumvent it.

But while I agree with the general view that discrimination based <u>solely</u> on nondischargeability is unfair, nondischargeability must nonetheless factor into the fairness analysis. Implicit in the *Leser/Wolff* test's first prong (whether proposed discrimination has a reasonable basis) is a strong consideration for the congressional goal of encouraging repayment of nondischargeable general unsecured debts in a timely manner.[2] *See Leser,* 939 F.2d at 672; *Wolff*, 22 B.R. at 512. By excepting student loan obligations from discharge, Congress has long made clear its objective regarding student loan repayment. *Machado*, 378 B.R. at 17. This congressional aim, however, is not paramount.

"The principal purpose of the Bankruptcy Code is to grant a fresh start to the honest but unfortunate debtor." *Marrama v. Citizens Bank of Mass.*, 549 U.S. 365, 367 (2007) (quoting *Grogan v. Garner*, 498 U.S. 279, 286-87 (1991)). Congress and the judiciary are constantly striving to achieve a wise balance between this fresh start policy, which *is* paramount, and the obvious primary competing aim of the Bankruptcy Code. As stated by Bankruptcy Judge Black, "Any exercise of judicial discretion under the Bankruptcy Code should be informed by the two fundamental concepts of a fresh start for debtors and fairness to creditors." *In re Forte*, 341 B.R. 859, 869 (Bankr. N.D. Ill. 2005). While Congress has chosen to treat certain creditors differently than others for a variety of policy reasons, §§ 507, 523(a)(8), and 1322(b) combine with the rest of the Bankruptcy Code to require a fair balancing of:

    (1)    the Debtor's fresh start;

    (2)    the clear legislative objective of student loan repayment; and

    (3)    fair treatment of creditors as a whole.

---

[2] While *Leser* dealt with nondischargeable general unsecured child-support payments, the underlying congressional goal is consistent with the repayment of student loans.

*Compare Marrama*, 549 U.S. at 367 *with Groves*, 39 F.3d at 214 *and Leser,* 939 F.2d at 672 and *Belda*, 315 B.R. at 486 *and Machado*, 378 B.R. at 16 *and Pora*, 353 B.R. at 252 *and Kalfayan*, 415 B.R. at 910 *and Gonzalez*, 206 B.R. at 242 *and Colfer*, 159 B.R. at 611.

*Balancing the Three Competing Aims*

The Debtor argues that failure to discriminate in favor of her student loans may result in late fees, penalties, and collection fees which could, over the course of her five-year Chapter 13 Plan, exceed 25% of the $22,329 student loan balance. *See* [DE 46], ¶ 2.  Discriminating in favor of the Debtor's student loans is tempting because it furthers: (1) the Debtor's fresh start; and (2) the clear legislative objective of student loan repayment.  Discrimination becomes even more tempting when one considers that impairment of the Debtor's fresh start is stark in Chapter 13 and runs counter to Congress' central premise in passing BAPCPA: "to steer debtors away from Chapter 7 and into Chapter 13." ELIZABETH WARREN AND JAY LAWRENCE WESTBROOK, THE LAW OF DEBTORS AND CREDITORS 345 (Aspen Publishers 2008); *see also In re Hardacre*, 338 B.R. 718, 720 (Bankr. N.D. Tex. 2006) ("Among the abuses identified by Congress was the easy access to chapter 7 liquidation proceedings by consumer debtors who, if required to file under chapter 13, could afford to pay some dividend to their unsecured creditors.") (citing 151 CONG. REC. S2459, 2469-70 (March 10, 2005)).

But as tempting as discrimination may be, it only furthers the first two congressional aims in the balance I am required to strike.  The third aim weighs heavily against discrimination because of the significant harm to remaining unsecured creditors.  If one could (1) reduce impairment of the Debtor's fresh start while (2) honoring Congress' goal of student loan repayment and (3) giving remaining unsecured creditors a fair deal, perhaps a better balance could be struck.

*The Bankruptcy Code Permanently Enjoins Sallie Mae from Charging Late Fees, Penalties, or Collection Fees which Are Based upon Pro Rata Chapter 13 Plan Distributions Being Less than the Minimum Monthly Payments Required by Contract, Balancing:*
*(1) the Debtor's Fresh Start;*
*(2) Congress' Goal of Student Loan Repayment; and*
*(3) Fair Treatment of Creditors As A Whole.*

"The stay of section 362 is extremely broad in scope and, aside from the limited exceptions of subsection (b), applies to almost any type of formal or informal action taken against the debtor or the property of the estate." 3 COLLIER ON BANKRUPTCY ¶ 362.03 (15th ed. 2008). "Congress intended the stay to afford debtors breathing room and to assure creditors of equitable distribution." *Soares v. Brockton Credit Union (In re Soares)*, 107 F.3d 969, 977 (3d Cir. 1997) (citing H.R. Rep. No. 95-595, at 340 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6296-97).

The student loan debt owed to Sallie Mae is nondischargeable, and regular interest may accrue on the unpaid balance throughout the life of the Chapter 13 Plan. *See, e.g., Wray v. Harrison,* 1997 U.S. Dist. LEXIS 15912 (E.D. Va. 1997) (citing *In re Shelbayah*, 165 B.R. 332, 337 (Bankr. N.D. Ga. 1994))*; Wagner v. Ohio Student Loan Comm'n (In re Wagner),* 200 B.R. 160, 163-64 (Bankr. N.D. Ohio 1996). Interest accrued on nondischargeable debt is, of course, also nondischargeable. *See id.* (incorporating principles articulated in *Bruning v. United States*, 376 U.S. 358 (1964)).

But while regular interest may accrue, a penalty may not be imposed unless specifically exempted from the automatic stay. *Compare Looney v. United States,* 336 Fed. Appx. 434, 436 (5th Cir. 2009) (not designated for publication) *with Shelbayah*, 165 B.R. at 337 *and Wagner,* 200 B.R. at 163-64 *and Bruning*, 376 U.S. 358. An example of such a specific exemption is § 1322(b)(2)'s treatment of mortgage lenders such that no Chapter 13 Plan may "exclude collection of fees and costs incurred postpetition and allowed by the mortgage contract." *Rodriguez v. Countywide Home*

*Loans, Inc. (In re Rodriguez)*, 2009 Bankr. LEXIS 4004 (Bankr. S.D. Tex. 2009). The Bankruptcy Code gives student loan lenders no such exemption.

While mere internal bookkeeping entries by a creditor do not in and of themselves violate the automatic stay, *Kerney v. Capital One Fin. Corp. (In re Sims)*, 278 B.R. 457, 471 (Bankr. E.D. Tenn. 2002), if Sallie Mae were to charge the Debtor late fees, collection fees, or any other penalty based solely upon its *pro rata* Chapter 13 Plan distributions being less than the minimum monthly payments it would otherwise be contractually entitled to during the life of the five-year Plan, such charges would not be mere internal bookkeeping entries. *Sims* held that "mere internal bookkeeping entries . . . do not generally produce any effect on the debtor," but also held within the same page that those very same entries would be stay violations if: (1) they were communicated to the debtor; (2) there were some other "overt act;" or (3) **the bookkeeping entries had a resulting effect upon the debtor**. *Id.*

The Debtor's stated reason for bringing this matter before me is her fear of these bookkeeping entries, "which may exceed 25% of the current balance of the loan." [DE 46], ¶ 2. The Debtor is proposing to discriminate in favor of Sallie Mae and to the detriment of her other unsecured creditors to avoid these bookkeeping entries and the resulting impairment of her fresh start. Given that bankruptcy courts have consistently held that phone calls, withholding of transcripts, and a litany of other less egregious acts are stay violations, it is difficult to see how post-petition assessments potentially amounting to 25% percent of the student loan balance could be anything other than "any act to collect, assess, or recover a claim against the [D]ebtor that arose before the commencement of the case under this title." 11 U.S.C. § 362(a)(6). While § 362(a) cannot stay actions specifically authorized elsewhere in the Bankruptcy Code, *Sims*, 278 B.R. at 472,

I have noted above that Sallie Mae is not specifically authorized by the Bankruptcy Code to assess late fees, collection fees, or any other penalties based solely upon its *pro rata* Chapter 13 Plan distributions being less than the minimum monthly payments it would otherwise be contractually entitled to during the life of the five-year Plan.

So the automatic stay prohibits Sallie Mae from charging these fees and penalties while the Debtor is in bankruptcy, but its protection ceases when the Debtor emerges from bankruptcy. If Sallie Mae were to subsequently assess fees and penalties based solely upon its *pro rata* Chapter 13 Plan distributions being less than the contract's minimum monthly payments, Sallie Mae would essentially be "back-dating" those transactions. The effective dates of such assessments would therefore fall within the scope of § 362(a)(6)'s protection. At least that is one argument. A better argument is that § 1328 discharges such assessments because the student loan debt is not being "provided for under section 1322(b)(5)" and only the principal and regular interest is debt "of a kind specified in section 523(a)." *See* § 1328(c).

For three decades, Congress has repeatedly taken steps to encourage the use of Chapter 13. *See, e.g.,* H.R. Rep. No. 595, 95th Cong., 1st Sess. 117-18 (1977); 151 CONG. REC. S2459, 2469-70 (March 10, 2005). Included in Congress' efforts are the availability of a broader discharge to Chapter 13 debtors:

> Bankruptcy courts and commentators have observed that the distinction between the chapter 13 and chapter 7 discharge provisions represents an important advantage afforded those seeking relief under chapter 13 . . . [T]he Seventh Circuit stated that the broader chapter 13 discharge provisions were intended by Congress as an incentive for debtors to complete performance under their plans.

COLLIER ON BANKRUPTCY ¶ 1328.02[2][b] (citing, *inter alia*, *Ravenot v. Rimgale (In re Rimgale)*, 669 F.2d 426 (7th Cir. 1982); *Cleveland Trust Co. v. Keckler (In re Keckler)*, 3 B.R. 155 (Bankr.

-14-

N.D. Ohio 1980).  So as I balance (1) the Debtor's fresh start, (2) the clear legislative objective of student loan repayment, and (3) fair treatment of creditors as a whole, it seems that discrimination in favor of Sallie Mae not only advances the first and second congressional goals at the impermissible expense of the third, but allowing Sallie Mae to assess penalties would impair the fresh start *and* undermine Congress' goal of ushering debtors into Chapter 13.  Striking a balance between Congress' goals means that Sallie Mae must refrain under § 362(a)(6) from charging late fees, collection fees, or any other penalties based solely upon its *pro rata* Chapter 13 Plan distributions being less than the minimum monthly payments it would otherwise be contractually entitled to during the life of the five-year Plan.  Striking a balance between Congress' goals also means that § 1328 prevents Sallie Mae from doing an end run around § 362(a)(6).

The Debtor's Plan will not separately treat her student loan debt under § 1322(b)(5) because I find that discrimination in this case would be unfair.  Sallie Mae will receive its pro rata share under the Chapter 13 Plan.  The unpaid prepetition balance of the student loan is nondischargeable under § 1328(c)(2) and will continue to accrue regular nondischargeable interest throughout the life of the Debtor's Chapter 13 Plan.  The automatic stay prohibits Sallie Mae from assessing penalties for payment shortfalls occurring while the Debtor is in bankruptcy, and § 1328 discharges such penalties should Sallie Mae ever attempt to assess them in the future.

## Conclusion

Statutory construction is a holistic endeavor, and § 1322(b)(5) must be read in light of (b)(1).  The Debtor may not invoke (b)(5) to discriminate in favor of Sallie Mae if such discrimination is unfair to her other unsecured creditors.

While Congress has chosen to treat certain creditors differently than others for a variety of policy reasons, §§ 507, 523(a)(8), and 1322(b) combine with the rest of the Bankruptcy Code to require a fair balancing of:

        (1)     the Debtor's fresh start;
        (2)     the clear legislative objective of student loan repayment; and
        (3)     fair treatment of creditors as a whole.

Because § 362(a)(6) and § 1328 combine to permanently enjoin Sallie Mae from charging late fees, collection fees, or any other penalties based solely upon its *pro rata* Chapter 13 Plan distributions being less than the minimum monthly payments it would otherwise be contractually entitled to during the life of the five-year Plan, *not* discriminating in favor of the student loan results in *de minimis* impairment of the Debtor's fresh start.

Failure to discriminate in favor of Sallie Mae does not frustrate Congress' clear objective regarding student loan repayment. At the conclusion of the Debtor's Chapter 13 Plan, Sallie Mae will still be entitled to its principal and regular interest on the unpaid balance, but the Debtor's finances will be in much better order, increasing her ability to stay current.

Further, not discriminating in favor of Sallie Mae avoids the substantial harm that discrimination would bring to the remaining unsecured creditors. Those discriminated against would <u>forever</u> lose their fair *pro rata* distribution. This permanent and substantial harm cannot outweigh Sallie Mae having to defer its full contractual recovery by a few short years.

It is therefore ORDERED that:

        (1)     the Debtor's Amended Motion to Separately Classify Student Loan Payments **[DE 46]** is **DENIED**;

      (2)      Sallie Mae is permanently enjoined from charging late fees, collection fees, or any other penalties based solely upon its *pro rata* Chapter 13 Plan distributions being less than the minimum monthly payments it would otherwise be contractually entitled to during the life of the five-year Plan.

# # #

<u>Copies to:</u>

Jeffrey Solomon, Esq.
3864 Sheridan St
Hollywood, FL 33021
(954) 967-9800
Email: <u>solomonjeffrey@hotmail.com</u>

Robin R Weiner
www.ch13weiner.com
POB 559007
Fort Lauderdale, FL 33355
954-382-2001

Mr. Solomon is directed to serve copies of this order upon and file a certificate of service.